**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| SOPEAR CHAN SOM, | ) | |
| | ) | |
| Plaintiff, | ) | Case. No. 10 C 1808 |
| v. | ) | |
| | ) | Magistrate Judge |
| Michael J. Astrue, | ) | Arlander Keys |
| Commissioner of Social | ) | |
| Security | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### FACTUAL BACKGROUND & PROCEDURAL HISTORY

#### PRE-DECISION PROCEDURAL HISTORY

On October 19, 2006 Ms. Som filed an application for Social Security Disability Insurance Benefits, claiming she became disabled and thus unable to work as of September 7, 2006. The Social Security Administration initially denied her application and she requested a hearing before an Administrative Law Judge. A hearing was held on February 18, 2009 before Administrative Law Judge ("ALJ") Janice M. Bruning. (R. 32-58).

#### POST-DECISION PROCEDURAL HISTORY

Ms. Som appealed the ALJ's decision, and on January 1, 2012, the Appeals Council denied review of her case, thus making the ALJ's decision the final decision of the Commissioner of the Social Security Administration. Ms. Som then filed this current lawsuit on March 22, 2010, seeking a review of that decision. The parties consented to the case being tried before a United

States Magistrate Judge, and the case was assigned to the Court on June 9, 2010.  Thereafter, the Commissioner filed a motion for summary judgment.

Ms. Som seeks a reversal or reversal and remand of the case, arguing that the ALJ: (1) failed to conduct a functional assessment of whether the claimant had a medically determinable severe impairment when she considered three of Ms. Som's impairments to be severe, but did not assess them in combination with her other impairments documented in the medical records, therefore she argues the ALJ came to an erroneous step two determination; (2) the ALJ failed to compare Ms. Som's medical condition to the listed impairments as required under 404.1526(a), therefore she argues the ALJ came to an erroneous step three determination; (3) the ALJ's credibility determination was patently wrong; (4) the ALJ failed to conduct a function-by-function analysis of Ms. Som's capacity to undertake work-related activities and failed to provide a narrative statement of her functional analysis of Som's RFC, thus she argues the ALJ came to an erroneous step four analysis; and (5) the ALJ failed to include Ms. Som's impairments and limitations in hypotheticals proposed to the Vocational Expert ("VE") and ignored Ms. Som's attorney's cross-examination of both Ms. Som and the VE, thus she argues it led the ALJ to come to an erroneous step five determination.

Ms. SOPHEAR SOM

Ms. Som, age thirty-nine at the time of the hearing, appeared and was represented by counsel and assisted by an interpreter.  She testified that she was married and did not have any children under the age of eighteen.  (R. 35).  She testified that she lived with her husband and two children, and that her husband worked.  (R. 36).  She testified that she was five feet, two inches tall and weighed 130 pounds.  (R. 35).  She testified that she had a high school level of education, which she obtained in the United States, but possessed no further specialized or vocational training.  (R. 36).  She testified that she was able to read the Chicago Tribune or Sun Times newspaper, but could not write a letter in English very well.  (R. 36).  She testified that she did not receive any assistance from the State of Illinois, nor had she filed for unemployment compensation or workers' compensation since September 7, 2006.  (R. 37).

Ms. Som testified that her last day of work, which also is her alleged onset date, was on September 7, 2006.  (R. 37).  She testified that she stopped working due to injuries she sustained from an automobile accident.  (R. 37).  She testified that, after the accident, she could not work because she was experiencing "tightness" in her back and head while she sat.  (R. 37).  Because she was not able to sit for long periods of time, Ms. Som testified that she requested her employer to allow her to only

3

work for four hours because she was not able to sit for long periods of time. (R. 37). She testified that she began to see several doctors concerning her condition. (R. 38). She then testified that soon, after she requested shorter hours, her employer informed her she was no longer able to work for them. (R. 38).

Ms. Som testified that after being released from employment, she continued to see her doctor, who put her on a physical therapy regiment. (R. 38). She testified that the physical therapy did not provide her any relief and her doctor sent her to a university hospital to have her spine examined. (R. 38). From that point on, she testified that her condition only began to deteriorate; she began experiencing problems with moving and picking up her arm and she felt the presence of pain in her neck, leg, and back. (R. 38). She testified that she was diagnosed with fibromyalgia after seeing several doctors and a specialist. (R. 38). She then testified that the pain in her neck radiated down her entire body and caused her to feel "tight" when she walked, as if she were carrying a heavy load on her back. (R. 38). She also testified that, because she had experienced constant pain, she was having problems sleeping. (R. 38).

Ms. Som testified that she was taking medication at the time of the hearing. (R. 39). She testified that she experienced side effects from the medication, which included upset stomach

and shortness of breath; however, when she notified her doctors of these adverse effects, her medication was changed. (R. 39). She identified her then current medication as Amitriptyline, Tylenol P.M., and Advil P.M., and an unidentified sleeping pill. (R. 39). She also testified to using a heating pad on both of her legs throughout the day and night to alleviate pain. (R. 39-40). She testified that she received back injections, but that they only helped her condition for a short period of time, and she was eventually told she could no longer receive the injections. (R. 40). She then testified that her doctors never suggested surgery for her back. (R. 40).

Ms. Som testified that she had been seeing Dr. Carpenter for her fibromyalgia since 2006, once every two months initially and then once every three months. (R. 41). She testified that Dr. Carpenter had told her that she needed to exercise daily and get plenty of sleep, given her condition. (R. 41). Next, she testified that she was not seeing a psychologist, psychiatrist, or mental health specialist. (R. 41). When asked if she took any antidepressant medication, she testified that she could not remember since she was given various types of medications after her automobile accident. (R. 41). She also testified that she could not remember, but it was possible, that it was suggested that she see someone for depression. (R. 41).

When it came to her daily activities, Ms. Som testified that she was able to walk a block, but then needed to sit afterward. (R. 42). She testified that she could stand for ten minutes while performing tasks around the house before she began to feel "tightness" in her back and legs that caused her to sit down. (R. 42). When asked how long she was able to sit, Ms. Som testified that she could only sit for fifteen to twenty minutes before she had to lie down as a result of feeling more "tightness," which negatively affected her ability to use the restroom. (R. 42). She testified that she did not take any medication for her bowel movement issues nor had she had any testing regarding any related issues. (R. 42-44). She testified she mentioned the issue to her doctor, but that he told her to continue to sit and lie down since it was induced by the fibromyalgia. (R. 43).

When asked how many pounds she could lift, Ms. Som testified that she could not lift very much nor could she twist off the cap of a gallon of milk due to the pain she experienced. (R. 44). She testified that she had difficulty climbing stairs, but did so at home by "stretching" up them as her doctor had instructed. (R. 44). She testified that she did not use a cane or other assistive device to get around, but had difficulty standing up. (R. 45). When questioned, she also testified to having difficulty bending, stooping, crouching, crawling, kneeling, and

reaching overhead. (R. 45). She testified that she was able to reach forward with more mobility than overhead, but still felt some discomfort. (R. 45).

Ms. Som testified that she took naps during the day, but when she felt pain she needed to take medication in order to fall asleep. (R. 45). She testified that she prepared some meals for herself and she did drive, but only to her doctor and back. (R. 45). She also testified to going to stores to perform errands with her husband on the weekends, washing the light dishes and leaving the heavy dishes to her daughter, some laundry, and making the bed with light blankets. (R. 46). She testified that she does not take out the garbage, perform yard work, or perform any activities similar to snow removal. (R. 47).

When asked if she socialized, Ms. Som testified that people from her church would come to visit her to talk, to read the Bible, and to pray. (R. 47). She testified that she had gone to church every Sunday, but never went out anywhere else. (R. 47). She testified that she preferred to read the Bible for enjoyment and watched a little television, but did not watch it often because the news made her sad. (R. 48). When asked about pets, she testified that she did not have one. (R. 48). She testified that she did own a computer, but never used it for any purpose. (R. at 48-49). She testified that her hobbies were watching Cambodian movies and comedies. (R. 49). When asked if she had

anything else to share, Ms. Som testified that since her problems began her life had changed, to the point where she felt like she wanted to die since she was unable to work or perform other tasks, but she had her church support group. (R. 49).

After the ALJ concluded her questions, Ms. Som's counsel questioned her directly. (R. 49). When questioned about memory problems by her counsel, she testified that she possessed them. (R. 49). She testified that she needed to write down that she had taken her medication every day; otherwise she would have forgotten she had already taken her pills. (R. 50). She also testified to one occasion where she was driving to the Jewel supermarket and had forgotten the purpose of her trip and drove a long distance past the store; which is why her husband no longer lets her drive. (R. 50). She testified that she also had problems paying attention, and would forget what was told to her by her attorney, even though she was aware of what was being said to her at the time. (R. 50).

Ms. Som testified that she would only sleep thirty minutes to three hours a night, which left her exhausted and upset. (R. 50). She testified that she experienced pain in her head, neck, and back if she sat for too long. (R. 50). She testified that she also experienced pain when she looked down or chewed. (R. 50). She testified that both her doctors, Dr. Carpenter and Dr. Paul, did not suggest that she was a candidate for surgery; and

Dr. Carpenter even told her specifically that she did not require surgery. (R. 51). When questioned about her daily activities, she testified that she watched television; ate; did exercises; and would lie down frequently throughout the day. (R. 51). She testified that if she sat for too long she experienced pain that radiated down her back and through her arms. (R. 51).

SUSAN ENTENBERG (VOCATIONAL EXPERT)

After Ms. Som, the ALJ heard from Susan Entenberg, a Vocational Expert ("VE"), who before testifying asked Ms. Som some questions before giving her testimony. (R. 53). Ms. Entenberg confirmed from Ms. Som that she had previously been employed as a caregiver roughly between 1997 and 1999. (R. 53). Ms. Som's duties as a caregiver were to take patients to and from their doctors, take them to buy groceries, and help them around the house, but she did not engage in lifting items. (R. 53. Ms. Entenberg then testified that Ms. Som had also previously been employed as an assembler/solderer, which had been her primary occupation. (R. 53). She testified that all her previous jobs in electronics, which included QC inspector and relay inspector, were sedentary and unskilled. (R. 53). She further testified that her previous employment as a caregiver was also light and unskilled. (R. 53).

The ALJ then asked Ms. Entenberg whether a hypothetical person that was Ms. Som's same age, held the same education, and

held the same work experience; that could lift ten pounds occasionally, less than ten pounds frequently; stand and/or walk two hours during an eight hour workday; sit six hours during an eight hour work day with an at will sit/stand option perform any jobs, including those in her past work history. (R. 53). Ms. Entenberg testified that such a person would not be able to perform the previous jobs they held, however, there were some assembler positions that would allow a sit/stand option at reduced numbers. (R. 53-54). She testified that in the Chicago metropolitan area, there were around 3,000 jobs that allowed for a sit/stand option. (R. 54). When asked by the ALJ if there would be any other jobs available to the hypothetical person, Ms. Entenberg testified that there were roughly 1,000 inspection positions available and roughly 2,000 packer positions also. (R. 54). She testified that, if the hypothetical person should be restricted to only unskilled jobs, the person would still be able to hold a packer, assembler, and/or inspection position. (R. 54).

After the ALJ completed her line of questions, Ms. Som's counsel proceeded to question Ms. Entenberg. (R. 54). When questioned whether she was including any information from the record in her answers to the hypothetical, Ms. Entenberg testified that she was only including information from the hypothetical, not the record. (R. 54). Ms. Entenberg testified

that the numbers she had given concerning the positions mentioned in her hypothetical answer did not include part time jobs. (R. 55). She testified that she arrived at her job position numbers by the number of jobs the Occupational Employment Statistics identified and reduced them by ten percent to arrive at the number of positions with sit/stand options; all of which was based on her thirty years of being a vocational rehabilitation and placement counselor. (R. 55).

Ms. Som's counsel then proposed a similar hypothetical individual to that of the one given by the ALJ, but instead of being able to work six hours a day the person was only able to work four hours a day, with a sit/stand option, and only able to stand and walk for two hours out of the day. (R. 55). Ms. Entenberg testified that the hypothetical individual would be working only six hours a day and thus less than full time. (R. 55). Ms. Som's counsel proposed a second hypothetical, similar to the ALJ's, except the individual needed a five minute walking break every sixty minutes. (R. 56). Ms. Entenberg testified that given the positions available to the individual, she would be allowed a sit/stand option but had to remain at her work station at all times given the nature of the job, thus she would not be able to maintain one of those positions. (R. 56).

Finally, Ms. Entenberg testified that an employee in those positions would not be able to take unscheduled work breaks

during the day. (R. 56). She testified that, if an employee in those positions also had difficulty and pain from looking down continuously, he or she would be incapable of working, since the position required one to be in a downward position whether sitting or standing. (R. 56-57). She testified that, if the individual needed to be absent more than four days a month, it would be beyond the absentee rate of approximately one day per month. (R. 57). When questioned whether the positions given would be able to be maintained by someone who had difficulties maintaining focus or concentration, for even two hours at a time, she testified that they would not be able to perform the work since they would need to maintain focus for eighty-five percent to ninety percent of the time, but no individual ever maintains concentration for 100% of the time. (R. 57).

MEDICAL RECORDS BEFORE THE ALJ

PHYSICAL AILMENT RECORDS

In addition to the testimony of Ms. Som and the VE, the ALJ also considered Ms. Som's relevant medical records from her doctors, whom she had been seeking treatment from concurrently.

MAGNETIC RESONANCE IMAGING ("MRI")

On July 27, 2006, Ms. Som underwent a cranial MRI of her brain after experiencing headaches, shoulder pain, and blurred vision as a result of a motor vehicle accident on July 22, 2006.

(R. 222). The results of this MRI indicated there was nothing abnormal with Ms. Som. (R. 222).

<u>DR. CHARLES KIM</u>

On August 30, 2006 Dr. Charles Kim diagnosed Ms. Som with possible cervical spondylosis with pain in the upper extremities. (R. 217). He noted that her MRI showed she had signs of congenital malformation of C1 with hyper mobility and sitting had an effect on the pain. (R. 214-215). Additionally, on September 27, 2006, Dr. Kim noted that Ms. Som's cervical spine x-ray showed an incomplete closure of the posterior elements of C1; the alignment was anatomic and there was no evidence of instability of both the flexion and extension views; there are no fractures nor prevertebral soft tissue swelling and no degenerative disc disease. (R. 196-197). The x-ray further showed there to be a mild bulging at C3-C4 and C4-C5 and a shallow bulge at C6-C7. (R. 197). Additionally, no acute motor or sensory deficit was noted in the upper extremities. (R. 210).

In a letter to a Dr. Jeffery Tomaszewski, dated October 12, 2006, Dr. Kim stated that Ms. Som was not a candidate for surgery. (R. 210). However, on November 28, 2006, he recommended that she participate in a therapy program that included soft tissue mobilization and myofascial release. (R. 205). He stated that the muscles in her neck needed to be stretched and strengthened. (R. 205). Dr. Kim then further

13

elaborated on her then current physical condition. Ms. Som's upper extremity strength was 5/5 and she had a 4/5 shoulder abduction. (R. 205). She had good forward flexion of the lumbar spine and negative straight leg raising both sitting and supine. (R. 205). She was limited in lateral flexion and extension. (R. 205). She had a normal range of motion bilaterally in her hips with external and internal rotation. (R. 205).

After undergoing an MRI on March 9, 2007, Dr. Kim noted minimal disc changes (minimal height loss and a diffuse bulge) at L4-L5 without foraminal stenosis, but the lumbar spine was normal in height and alignment. (R. 253). Finally, on March 20, 2007 Dr. Kim gave Ms. Som trigger point injections in the left and right of her neck. (R. 249).

DR. JOHN F. SHEA

The next doctor Ms. Som received treatment from was Dr. John F. Shea. On February 5, 2007, Dr. Shea examined Ms. Som, who complained of pain in her neck and back, down to the C5-C6 distribution of both arms and hands. (R. 236). He noted that she was experiencing pain from the knees down anteriorly. (R. 236). He further noted that her pain was aggravated by sitting, standing, gripping, and from combing her hair. (R. 236). She did not have any numbness, tingling, burning, or weakness in her extremities. (R. 236). She had strength of 5/5 in all myotomes. (R. 237). Her spine was straight, no cervical spasm on the

14

right, and a 1+ spasm on the right. (R. 237). Her lateral rotation was twenty degrees bilaterally and flexion ten degrees bilaterally. (R. 237). Her straight leg raising was negative and there were no signs of atrophy. (R. 237). She was able to walk toe and heal normally. (R. 237). Finally, Dr. Shea noted she had a congenital absence of the arch at C1, but did not think she had an acute fracture, and she had normal cortical functions. (R. 237).

DR. JOHANNA LANGE

Ms. Som also sought treatment from Dr. Johanna Lange, beginning on November 28, 2006. (R. 238). On March 14, 2007, Dr. Lange wrote a letter to Dr. Charles Kim in which she noted Ms. Som denied any problems with bowel or bladder incontinence or retention. (R. 269).

Furthermore, on March 26, 2007 Dr. Lange filled out a Physical Residual Functional Capacity Questionnaire ("RFCQ") on Ms. Som's behalf. (R. 238). Dr. Lange diagnosed Ms. Som with cervical, lumbar, upper/lower extremity myofascial pain. (R. 238). She noted tender palpation throughout the neck, arms, leg muscles; hypertonicity of cervical and scapular musculature; and pain within the range of the shoulder, elbows, and wrist. (R. 238). Ms. Som's impairments were not reasonably consistent with the symptoms and functional limitations according to Dr. Lange because she could not determine the cause of the severe pain

based on the cause from Ms. Som's neck and back; she had no weakness and only subjective pain. (R. 239). Dr. Lange felt emotional factors (most specifically depression) contributed to the severity of her symptoms and functional limitations. (R. 239). She frequently experienced pain/symptoms that could interfere with concentration and attention. (R. 239). In Dr. Lange's opinion, she was incapable of holding a "low stress" job. (R. 239). She could walk two city blocks, sit for two hours at a time, and stand for fifteen minutes at a time. (R. 239). She could sit for four hours and stand/walk for less than two hours in an eight hour work day. (R. 240). She needed to be allowed periods of walking during an eight hour work day for five minutes each and needed a job that permitted shifting positions at will from sitting, standing, or walking. (R. 240). She needed to take unscheduled breaks during an eight hour work day (possibly every one to two hours for ten minutes each). (R. 240). She could occasionally lift less than ten pounds at work, rarely ten pounds, and never twenty or fifty pounds. (R. 240). She could occasionally look down, frequently turn her head left or right, occasionally look up, and rarely keep her head in a static position. (R. 241). Finally, Dr. Lange predicted she was likely to be absent from work more than four days a month. (R. 241).

## DUPAGE MEDICAL GROUP

During all this time, Ms. Som had been receiving the physical therapy Dr. Kim recommended, from the DuPage Medical Group, starting on May 29, 2007. (R. 258). She was discharged from physical therapy that on July 27, 2007; by which time she had participated in thirteen sessions. (R. 258). In the discharge summery provided by the DuPage Medical Group, they noted that Ms. Som reported her overall pain level and the tightness in her jaw had significantly decreased and she was able to sleep better at night. (R. 258). Furthermore, it was noted that her cervical range of motion was within normal limits and her general upper extremity strength was 4-/5. (R. 258).

## DR. ROBERT CARPENTER

Additionally, Ms. Som was being treated by Dr. Robert Carpenter. On July 11, 2007 Dr. Carpenter came to an assessment of fibromyalgia and myofascial pain syndrome of the upper back. (R. 263). He noted that she complained of right back, chest, shoulder, legs, and arm pain. (R. 263-265). He also noted that her daily exercises were not relieving her pain. (R. 263). She was prescribed Neurontin 100 mg to be taken twice a day. (R. 263).

Dr. Carpenter also filled out a PRFCA on the State Agency's behalf on December 18, 2006. (R. 224). He reported that Ms. Som could occasionally lift and/or carry (including upward pulling)

17

twenty pounds. (R. 225). She could frequently lift and/or carry (including upward pulling) ten pounds. (R. 225). She could stand and/or walk (with normal breaks) for a total of about six hours in an eight hour workday. (R. 225). She could sit (with normal breaks) for a total of about six hours in an eight hour workday. (R. 225). She was not limited in pushing and/or pulling (including cooperation of hand and/or foot controls), other than as was previously shown for lifting and/or carrying. (R. 225). There were no established postural limitations by July 22, 2007. (R. 226). There were no manipulative limitations established. (R. 227). There were no visual limitations established. (R. 227). There were no communicative limitations established. (R. 228). There were no environmental limitations established. (R. 228). Finally, Dr. Carpenter stated that Ms. Som was expected to improve on or by July 22, 2007. (R. 231).

### MENTAL AILMENT RECORDS

In addition to reviewing all pertinent medical records which pertained to Ms. Som's physical ailments, the ALJ also considered all records pertaining to the mental and emotional issues that Ms. Som claimed to have suffered from.

### DR. CHARLES KIM

The first mention of any emotional issues, including depression, appeared on October 12, 2006 in a letter from Dr. Kim to Dr. Tomaszweski. (R. 210). In that letter, Dr. Kim mentioned

a history of depression, but did not mention that she was taking medication to counter it. (R. 210).

## DR. JOHANNA LANGE

The second mention by a physician concerning emotional issues (depression) occurred in a March 14, 2007 letter to Dr. Kim from Dr. Lange. (R. 269). In this letter, Dr. Lange indicated that she was referring Ms. Som to a pain psychologist and to her primary doctor to address her displays of depression. (R. 270). Additionally, she noted that Ms. Som was very resistant to pharmacological treatment for her depression. (R. 270).

## DR. ROBERT CARPENTER

The third and final physician to address any emotional issues (depression) was Dr. Carpenter. On March 27, 2008 he noted that Ms. Som denied suffering from depression on this particular visit. (R. 360). On June 9, 2008 Dr. Carpenter then prescribed her Amitriptyline (also known as Elavil); an antidepressant. (R. 363). Finally, on September 11, 2008, Dr. Carpenter diagnosed her with Post Traumatic Stress Disorder ("PTSD") after Ms. Som divulged that she was having dreams and flashbacks about her family escaping from Cambodia to Thailand and then changing their religion from Buddhism to Christianity. (R. 364).

THE ALJ'S DECISION

The ALJ issued her decision on April 14, 2009, finding that Ms. Som was not disabled within the meaning of the Social Security Act under sections 216(I) and 223(d). (R. 16). The ALJ applied the five step sequential analysis as required by the Act, under 20 C.F.R. 404.1520(a).

At step one, the ALJ determined that Ms. Som had not engaged in substantial gainful activity since September 7, 2006 (the alleged onset date). (R. 18).

At step two, the ALJ determined that Ms. Som had a number of severe impairments: congenital incomplete fusion of C1, fibromyalgia, and mild degenerative changes of the lumbosacral spine. (R. 18). The ALJ pointed out that these impairments caused more than minimal limitation in Ms. Som's ability to perform work activity. (R. 18). However, the ALJ found, by considering the four broad functional areas for evaluating mental disorders under section 12.00© of the listing impairments (20 C.F.R., Part 404, Subpart P, Appendix 1), that her medically determinable depression did nothing more than cause minimal limitation in her ability to perform basic mental work activities and thus was not severe. (R. 18). When it came to activities of daily living, the ALJ found that Ms. Som only experienced mild limitation and was able to perform most activities. (R. 18). Next, the ALJ found her only to be mildly limited when it came to social functioning and concentration (which included persistence

or pace). (R. 19). Additionally, the ALJ found that Ms. Som did not experience any episodes of decompensation since she was not being treated for, nor has she ever been treated for depression. (R. 19).

At step three, the ALJ concluded that Ms. Som did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments from 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1525 and 404.1526). (R. 19). First, the ALJ pointed out the fact that there was not a Listing criteria for fibromyalgia in Appendix 1. (R. 19). Furthermore, despite the fact that Ms. Som's congenital incomplete fusion of C1 and mild degenerative changes in her lumbosacral spine were covered under Listing 1.04, after having reviewed all medical records, the ALJ found that her conditions, whether alone or combined, did not meet the requirements of any Listing. (R. 20).

At step four, the ALJ concluded that Ms. Som's residual functional capacity would allow her to perform sedentary work as defined in 20 C.F.R. 404.1567(a). (R. 20). In making her decision, the ALJ noted that she considered all her symptoms and the extent to which the symptoms could reasonably be accepted as consistent with objective medical advice and other evidence as required under 20 C.F.R. 404.1529 and SSR's 96-4p and 96-7p. (R. 20). Additionally, the ALJ considered opinion evidence in accordance with 20 C.F.R. 404.1527 and SSR's 96-2p, 96-5p, 96-6p,

and 96-3p. (R. 20). Next, the ALJ briefly summarized the testimony of Ms. Som and stated:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. (R. 21).

The ALJ then summarized all of Ms. Som's medical records. (R. 23). After this review, the ALJ stated:

> I accept the clinical findings reported by the treating physicians as indicative of the claimant's ability to perform work activity within the residual functional capacity I have set forth above. I do not agree in totality with their assessments of her inability to sustain unskilled work. Further I do not agree with the State agency residual functional capacity which assessed the claimant's ability to perform work activity at the light exertional level. This assessment was made December 28, 2006 and without the benefit of additional medical documentation which was received at the hearing level. (R. 24).

Given both of these reasons, the ALJ found that Ms. Som's residual functional capacity would allow her to perform sedentary work as defined in 20 C.F.R. 404.1567(a).

At step five, after considering the testimony of the VE and the limits of her residual functional capacity, the ALJ determined that Ms. Som was unable to perform any past relevant work, under 20 C.F.R. 404.1565. (R. 24). However, the ALJ found that transferability of job skills was not material to the determination of disability because the use of the Medical-Vocational Rules (SSR 82-41 and 20 C.F.R. Part 404, Subpart P,

Appendix 2) supported a finding that Ms. Som was not disabled, whether or not the claimant had transferable job skills. (R. 24. Finally, after taking the VE's testimony into consideration that approximately 6,000 jobs existed of which Ms. Som could perform; the ALJ found there to be jobs that existed in the national economy that she could perform given her age, education, work experience, and residual functional capacity under 20 C.F.R. 404.1569 and 20 C.F.R. 404.1569(a). (R. 24-25). Thus, the ALJ found Ms. Som "not disabled." (R. 25).

After conducting the five step analysis, the ALJ found that Ms. Som had not been under a disability from September 7, 2006 through April 14, 2009; as defined under the Social Security Act, 20 C.F.R. 404.1520(g). (R. 25).

## STANDARD OF DISABILITY ADJUDICATION

In order to be entitled to benefits under the Social Security Act, a claimant must be evaluated under a five step inquiry and found to be "disabled." 20 C.F.R. § 404.1520. Step one requires the ALJ to determine if the claimant is employed. Under step two, the ALJ must determine whether the claimant has a severe impairment as defined by the Social Security Administration. At step three, the ALJ determines whether the impairment meets or is medically equal to one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. At step four, the ALJ evaluates the claimant's "Residual Functional Capacity" ("RFC") and determines whether she can perform her past

relevant work. Finally, at step five, the ALJ determines whether the claimant has the ability to perform other work that is prevalent in the national economy.

## STANDARD OF REVIEW

When addressing an appeal of an ALJ's decision, a district court must affirm the decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). When determining whether the evidence is substantial, it must be "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 401 (1971). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* When reviewing the ALJ's decision for substantial evidence, the court cannot "displace the ALJ's judgment by reconsidering facts or evidence or making [a] credibility determination." *Skinner v. Astrue,* 478 F.3d 835 (7th Cir. 2007). Should there be conflicting evidence that leads reasonable minds to differ in opinion, it is solely the ALJ's responsibility to determine whether the claimant is disabled, not the district court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). Even though an ALJ is not required to address every piece of evidence in the record, she must furnish her analysis through building a logical and accurate bridge between the evidence and her conclusions, thus allowing a reviewing court to conduct a meaningful review of the ultimate findings of the Social Security Administration. *Sims v. Barnhart*, 309 F.3d 424,

429 (7th Cir. 2002); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). A court must affirm an ALJ's decision if there is substantial evidence supporting her decision, unless the ALJ does not articulate the grounds for her decision in such a way that allows a meaningful review. *Sims*, 309 F.3d at 429.

## DISCUSSION

Ms. Som seeks a reversal or a reversal and remand of the Commissioner's decision, arguing that the ALJ: (1) failed to conduct a functional assessment of whether she had a medically determinable severe impairment, therefore she argues that the ALJ came to an erroneous step two determination; (2) the ALJ failed to compare Ms. Som's medical condition to the listed impairments as required under 20 C.F.R. § 404.1526(a), therefore the ALJ came to an erroneous step three determination; (3) the ALJ's credibility determination was patently wrong; (4) the ALJ failed to perform a function-by-function analysis of Ms. Som's capacity to undertake work-related activities and failed to provide a narrative statement of her functional analysis of Som's RFC, thus the ALJ came to an erroneous step four analysis; and (5) the ALJ failed to include Ms. Som's impairments and limitations in hypotheticals proposed to the Vocational Expert ("VE") and ignored the cross-examination of the VE, thus the ALJ arrived at an erroneous step five determination.

SEVERE IMPAIRMENTS ANALYSIS

Ms. Som first argues that the ALJ failed to conduct a proper step two determination. She alleges that the ALJ failed to conduct a functional assessment of whether she possessed a medically determinable severe impairment. She further alleges that, despite the ALJ mentioning and considering three of her impairments as being severe, the ALJ did not assess them in combination with Ms. Som's other impairments and symptoms that were contained in her medical records. The Commissioner has failed to respond to this portion of the argument.

As Ms. Som has correctly stated, 20 C.F.R. § 404.1520(a)(4)(ii) requires an ALJ to determine whether a claimant suffers from a medically severe impairment under step two. In order to determine if an impairment is disabling, the impairment must result from "anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508. Furthermore, "[a] physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms. 20 C.F.R. § 404.1508. Since "a determination whether an impairment(s) is severe requires an assessment of the functionally limiting effects of an impairment(s), symptom-related limitations and restrictions must

be considered at this step of the sequential evaluation process, provided that the individual has a medically determinable impairment(s) that could reasonably be expected to produce the symptoms." SSR 96-3p, 2; 1996 WL 374181, 2 (S.S.A.).

In her decision, the ALJ found the claimant to have been suffering from three severe impairments: congenital incomplete fusion of C1, fibromyalgia, and mild degenerative changes of the lumbosacral spine. (R. 18). The ALJ explained her findings by stating "[t]he symptoms related to the above impairments cause more than minimal limitation in the claimant's ability to perform work activity." (R. 18). However, despite this finding of severe impairment and her brief, one sentence explanation to support it, the ALJ failed to further articulate how this determination was reached. No evidence, medical or otherwise, has been referenced to show that Ms. Som was experiencing any symptoms from the listed conditions aside from the ALJ stating that they caused more than minimal limitation. As a result, there is no clarification as to how the ALJ reached her conclusion.

However, despite this seeming lack of supporting analysis of the evidence, the ALJ still found Ms. Som to exhibit medically severe impairments. Since the ALJ found some of Ms. Som's impairments to be severe, it can be assumed that she carefully analyzed the evidence at this step. Furthermore, "[o]nly when an ALJ finds that a plaintiff's impairments are not severe is he

required to provide explanatory documentation at this step."
*Beach v. Astrue*, 2010 WL 3168292 (N.D. Ill. 2010). Therefore,
this is not an error that gives cause for remand since the ALJ
found in Ms. Som's favor.

<u>MENTAL IMPAIRMENT ANALYSIS</u>

Ms. Som argues that the ALJ failed to properly conduct an
assessment of her mental impairments by skewing the analysis of
the criteria from Listing 12.00© as well as omitting Listing
12.00(A) from  20 C.F.R. § 404, Subpart P, Appendix 1.
Additionally, Ms. Som argues that the ALJ further erred in her
analysis by not recognizing Ms. Som's PTSD as a mental impairment
along with her depression.  The Commissioner responds to Ms.
Som's argument by asserting that the ALJ properly evaluated her
mental impairments, the omission of 12.00(A) is incorrect because
the ALJ found she had an impairment of depression, and even
though her PTSD was not recognized it is of no consequence
because the ALJ proceeded to evaluate her mental impairment under
12.00©.

Listing 12.00, 20 C.F.R. § 404, Subpart P, Appendix 1,
addresses the evaluation of mental disorders.  12.00(A) through
12.00(I) act as the introductory guidelines for which the latter
mental conditions are to be evaluated upon.  However, even though
they may mirror the introductory paragraphs, each mental
condition requires its own analysis, which must also be followed
under the guidance of those laid forth under 12.00(A)-(I).

Under 12.00(A), "[t]he evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on [the claimant's] ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404, Subpart P, Appendix 1. However, this section is merely an introduction to the Mental Disorders section of the listings, and further breaks down each type of mental disorder into several categories to be further analyzed:

> Organic mental disorders (12.02); schizophrenic, paranoid and other psychotic disorders (12.03); affective disorders (12.04); mental retardation (12.05); anxiety-related disorders (12.06); somatoform disorders (12.07); personality disorders (12.08); substance addiction disorders (12.09); and autistic disorder and other pervasive developmental disorders (12.10).

20 C.F.R. § 404 app. 1, 12.00(A).

After an ALJ has determined that there is a medically determinable impairment under Section 12.00(A), she must then move on to the next step in the analysis; which will either be 12.00(B) or 12.00(C). 12.00(B), of 20 C.F.R. § 404app. 1, further solidifies the need for medical evidence, as its title clearly states, which is used to further "establish the existence of a medically determinable impairment(s) of the required duration by medical evidence consisting of symptoms, signs, and

laboratory findings (including psychological test findings)."
20 C.F.R. § 404 app. 1.

And finally, under 12.00(C), of 20 C.F.R. § 404 app. 1, an ALJ measures the severity of a claimant's mental conditions according to the functional limitations imposed by her medically determinable mental impairment by using the four criteria in paragraph B of the listings they fall under. These are:

> Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Where [an ALJ] use[s] "marked" as a standard for measuring the degree of limitation, it means more than moderate but less than extreme.
>
> 20 C.F.R. § 404 app. 1, 12.00(C).

A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis. 20 C.F.R. § 404 app. 1.

In her written decision, the ALJ found that Ms. Som possessed a "medically determinable mental impairment of depression[,]" but further finds it nonsevere because it does not cause more than minimal limitation in Ms. Som's ability to perform basic mental work activities. (R. 18). The ALJ then continued to assess Ms. Som's depression under the criteria set forth under 12.00(C). However, despite the ALJ determining Ms. Som suffered from depression, her decision failed to elaborate on

how this determination was made, nor did it explain under which of the supplied categories of mental disorders Ms. Som fell under. Even though the ALJ appeared to conduct an accurate analysis under the general guidelines of 12.00(C), without actually identifying which listed mental disorder Ms. Som fell under, it is impossible to conduct a proper review of her alleged impairments.

Furthermore, as Ms. Som noted, in her decision the ALJ failed to mention Ms. Som having been diagnosed with PTSD. It may have been the intentions of the ALJ to include the PTSD in the finding of mental depression, or it may have been her intention to dismiss it as being a nonsevere impairment. However, since there is no mention of it at this step in the evaluation process, the Court is unable to conduct a meaningful review to determine whether the evidence supported the ALJ's conclusion.

STEP THREE DETERMINATION

Next, Ms. Som argues that the ALJ's step three determination of her condition not medically equaling a listed impairment was erroneous. More specifically, Ms. Som alleges that the ALJ failed to conduct a complete evaluation of her fibromyalgia. Ms. Som agrees with the ALJ, in that there is not a Listing in Appendix 1 for fibromyalgia, however, she argues that the ALJ failed to conduct a full inquiry by failing to compare this condition to other listings to which it may be equivalent.

Under 20 C.F.R. § 404.1526(b)(2), if a claimant has an impairment that is not described in Appendix 1, the ALJ "will compare [the claimant's] findings with those for closely analogous listed impairments." "If the findings related to [the claimant's] impairment(s) are at least of equal medical significance to those of a listed impairment, [the ALJ] will find that [the claimant's] impairment(s) is medically equivalent to the analogous listing." 20 C.F.R. § 404.1526(b)(2). Furthermore, when an ALJ is determining whether a claimant's impairments meet or equal a listed impairment, "an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). In *Barnett*, 381 F.3d at 670, the court found the ALJ's two-sentence step two determination was "inadequate and warrant[ed] a remand[,]" even though it could be inferred which Appendix 1 listing the ALJ had considered.

In the case at hand, the ALJ's step two analysis for Ms. Som's fibromyalgia consists of only one sentence. The ALJ stated, "[t]here are no Listing criteria in Appendix 1 specific to the evaluation of fibromyaligia." (R. 19). No further evaluation or comparison appears to have been conducted by the ALJ, as required by 20 C.F.R. § 404.1526(b)(2). Given that there is no further explanation, even if the ALJ did not find that any of Ms. Som's impairments medically met listed impairments, there is no indication that the ALJ conducted an equivalence analysis.

Therefore, the ALJ's one-sentence consideration at step three, coupled with her lack of an attempt to engage in an equivalence analysis as mandated by § 404.1526, is inadequate and warrants remand. *Beach v. Astrue*, 2010 WL 3168292 (N.D. Ill. 2010).

CREDIBILITY FINDING

Ms. Som next argues that the ALJ's credibility determination of her symptoms is patently wrong. First, Ms. Som alleges that the ALJ made use of "boilerplate" language to characterize her credibility assessment that did not divulge the weight given to specific testimony given by her, therefore it is improperly executed. Additionally, Ms. Som alleges that the ALJ enlisted the use of "boilerplate" language to explain her credibility determination of the RFC. Ms. Som argues that this "boilerplate" language created a standard of credibility that invalidated any statements that were inconsistent with it. The Commissioner argues that the ALJ's credibility determination was not patently wrong due to the use of "boilerplate" language. The Commissioner argues that the mere fact that "boilerplate" language is used only leads to reversal when the ALJ provides no explanation to her conclusion, and therefore, the ALJ's determination is not patently wrong as it is supported by an explanation. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

When it comes to determining the credibility of an individual's statements:

> [T]he adjudicator must consider the entire case record, including the objective medical evidence, the

individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

SSR 96-p7; 1996 WL 374186 (S.S.A.), 1.

Additionally, it is not sufficient for an ALJ to make a single, conclusory statement that the individual's allegations have been considered or that the allegations are (or are not) credible. SSR 96-p7; 1996 WL 374186, 2. "Such boilerplate language fails to inform [a reviewing court] in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible. *Bjornson v. Astrue*, 2012 WL 280736 (7th Cir. 2012). The determination must contain specific reasons for the finding on credibility, it must be supported by the evidence in the case record, and it must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the ALJ gave to the individual's statements and the reasons for that weight. SSR 96-p7; 1996 WL 374186, 2. Therefore, an ALJ is required to articulate the reasons behind her determination.

When it comes to reviewing credibility determinations, ALJ's are given deference by a reviewing court. As the Commissioner has argued correctly, "[a]n ALJ is in the best position to determine a witness's truthfulness and forthrightness; thus, [a]

34

court will not overturn an ALJ's credibility determination unless it is "patently wrong." *Skarb v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

Ms. Som notes that the first instance of credibility determination occurs during step four of the ALJ's overall analysis. After providing a recap of Ms. Som's hearing testimony and her medical records, the ALJ concludes her credibility determination of Ms. Som's testimony by stating, "[g]iven the inconsistencies in the claimant's statements regarding her symptoms and limitations versus her medical record and actual activities, I find the claimant's testimony not fully credible." (R. 24). After this one-sentence conclusion, the ALJ ceases to further discuss Ms. Som's credibility.

Despite Ms. Som's argument that the ALJ used an improper "boilerplate" determination, the Commissioner is correct in arguing that the credibility determination is not patently wrong simply because "boilerplate" language is used. In this instance, even though the ALJ's credibility determination concluded with a one-sentence determination, it has been sufficiently supported by the ALJ's recap of Ms. Som's testimony and medical records. Within that recap, the ALJ provided the evidence she used in making her determination, including instances where her testimony and her medical records conflicted. Furthermore, even though the ALJ may not have mentioned every inconsistency which led to her determination, as noted before, when an ALJ provides a logical

bridge between the evidence and her conclusion, she need not discuss every piece of evidence. *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Therefore, since the ALJ's credibility determination is not patently wrong simply by the use of "boilerplate" language, the Court will not overturn the credibility determination.

STEP FOUR RFC DETERMINATION

Next, Ms. Som argues that the ALJ's step four RFC determination was erroneous. First, Ms. Som alleges that the ALJ erred by omitting a function-by-function analysis of her capacity to undertake work-related activities. Second, Ms. Som argues that the ALJ's decision at this step is nothing more than a summary of her testimony and her medical records and is void of in-depth analysis. However, Ms. Som alleges that this summary is filled with evidence and testimony that has been "cherry-picked" by the ALJ to support her decision. Next, Ms. Som argues that the ALJ "played doctor" by claiming the medical records displayed "normal clinical findings" (R. 22) for her range of motion and strength, and further proceeded to do so when the ALJ stated that she disagreed with some of Ms. Som's treating physicians findings (R. 24) concerning her inability to sustain unskilled work. Finally, Ms. Som argues that the ALJ continued to "cherry-pick" facts that downgraded her claim to disability and failed to undertake detailed inquiries into her activities of daily living,

her diagnosis and treatment of depression and PTSD, and failed to include a functional analysis of all the limitations presented by the medical evidence; which includes fibromyalgia, pain, and depression.

The Commissioner contends that the ALJ correctly conducted the RFC determination, and that the evidence supports her conclusion. He argues that the ALJ properly weighed the medical evidence as required by law, in that the ALJ is not required to perform an analysis concerning limitations where there is no conflicting medical evidence. Furthermore, the Commissioner asserts that when there is conflicting evidence, as there was in this case, it is the ALJ's responsibility to resolve the conflict; and in this case the ALJ chose the middle ground. The Commissioner argues that the ALJ did not "cherry-pick" the evidence that best supported her decision, but rather provided an in-depth narrative of the entire medical record and the hearing testimony.

At step four, an ALJ determines a claimant's RFC, or the maximum work that a claimant can still do despite any limitations. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p; *Craft v. Astrue*, 539 F.3d 668, 675-6 (7th Cir.2008). In determining RFC, an ALJ must base her decision on the medical evidence in the record and other evidence, including testimony by the claimant. *Craft*, 539 F.3d at 676. Furthermore, mental limitations must be a part of the determination since a "limited ability to carry out

certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce [a claimant's] ability to do past work and other work." 20 C.F.R. § 404.1545(c); *Craft*, 539 F.3d at 676.

First, Ms. Som is correct in that step four requires a function-by-function analysis. SSR 96-8p states that "[an] RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 96-8p; 1996 SSR LEXIS 5 at 1. In the case at hand, the ALJ first described the process followed in step four, summarized Ms. Som's testimony and her medical records, and provided some insight into how her determinations were reached; as far as her activities of daily living and her credibility. Despite Ms. Som's argument that the ALJ "cherry-picked" evidence that only supported her determinations, the ALJ provided a very detailed summary of both hearing testimony and the medical records; which provided both supporting and conflicting evidence. However, despite a thorough review of the hearing testimony and medical records, the ALJ failed to discuss each function and its effect on Ms. Som's work-related abilities, as required by SSR 96-8p. SSR 96-8p; 1996 SSR LEXIS 5 at *1. Such discussion is essential for the Court to provide a meaningful review. Thus, this error is cause for remand since the ALJ failed to comply with SSR 96-8p.

Ms. Som's argument is somewhat correct that the ALJ's analysis is merely a summary of the medical evidence and hearing testimony. The ALJ's decision at this step is indeed a very long summary of the evidence; however, the ALJ does include some analysis to her determinations. Nonetheless, despite the ALJ providing a few instances of her determinations and brief reasons as to how they were reached, it requires a reviewing court to make inferences based on the summary of evidence as to how the ALJ fully came to her determinations. An ALJ need not cite every piece of evidence, but they must "articulate at some minimal level his analysis of the evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). All though the Court is able to build its own logical bridge from the evidence to the ALJ's conclusions, the ALJ failed to fully complete the bridge herself.

Finally, Ms. Som is correct in arguing that an "ALJ cannot "play doctor" and make medical determinations based on facts provided in medical reports. *Myles v. Astrue*, 582 F.3d 672, 677, (7th Cir.2009). Mrs Som argues that the ALJ was "playing doctor" when she stated that she "find[s]the mostly normal clinical findings (i.e. range of motion and strength) indicate that these impairments are mild in terms of severity and do not cause the level of limitation that the claimant alleges." (R. 22). In this instance, there is no medical evidence in the record which contradicts Ms. Som's range of motion and strength; however, Ms. Som's testimony does contradict this when she stated that she

could not twist open a gallon of milk, (R. 44), and could reach forward (unless her back was tight), and had difficulty bending, kneeling, and reaching overhead. (R. 45). Given there was some question of Ms. Som's range of motion and strength, the ALJ imposed her opinion as to findings of what the medical records stated. An ALJ should use medical information and conclusions in making a determination based on the law, not make her own medical conclusions to apply to the law. *Beach v. Astrue*, 2010 WL 3168292, 13 (N.D. Ill. 2010).

Ms. Som argues that the ALJ continued to "play doctor" by rejecting the opinions of her treating physicians in their assessments of her being unable to sustain unskilled work (R. 24). The ALJ stated that she did not agree with the State Agency's RFC that assessed Ms. Som's ability to perform work activity at the light exortional level (R. 24) because it was made "without the benefit of additional medical documentation which was received at the hearing level." (R. 24). However, the ALJ does not provide a reason for rejecting the opinions of her treating physicians. The Commissioner is correct in stating that, when there is conflicting evidence, as in the instant case, it is the ALJ's responsibility to resolve the conflict. *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). However, as stated earlier, when resolving a conflict between medical evidence, an ALJ is not allowed to "play doctor" and impose her

own medical determination based on the facts in the records. *Myles*, 582 F.3d at 677.

Regarding the State Agency's assessment, the ALJ noted that information was unavailable to the assessing doctor when it was performed. Given this, it appears that there is conflicting evidence; however, the ALJ failed to give further reason as to why that evidence lead her to reject the State Agency's findings. In essence, the ALJ "played doctor" by determining that the evidence received at the hearing level outweighed the State's assessment, but provided no detailed insight as to how she arrived at that conclusion. Furthermore, the ALJ provided no reason as to why she rejected the opinions of Ms. Som's treating physicians when it came to their opinion of her ability to sustain unskilled work. Once again, the ALJ has failed to bridge the gap between the medical evidence and her determinations. Therefore, the Court cannot provide a meaningful review and the case must be remanded.

STEP FIVE DETERMINATION

Lastly, Ms. Som argues that the step five determination was erroneous since it was derived from an inadequately developed hypothetical posed to the VE. Ms. Som alleges that the ALJ failed to include any of her impairments and limitations in the hypothetical she proposed to the VE. Additionally, Ms. Som argues that the exception from *Ragsdale v. Shalala*, 53 F.3d 816,820 (7th Cir. 1995), in which a VE who has reviewed a

claimant's complete medical record is presumed to include that information in their responses to proposed hypotheticals, is not applicable in her case because the VE confirmed that she did not include any information from Ms. Som's records. Furthermore, Ms. Som alleges that the ALJ disregarded the VE's cross-examination testimony in making her decision, which Ms. Som believes proved that she would be unemployable.

The Commissioner opines that Ms. Som's assertion that the ALJ erred by failing to include her impairments and limitations in the hypothetical proposed to the VE is based on an incorrect interpretation of case law. The Commissioner argues that the case Ms. Som has cited, *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002), does not require an ALJ to list a claimant's impairments, but rather says that they "ordinarily must include all limitations supported by medical evidence in the record." *Id.* The Commissioner also cites *Donahue v. Barnhardt*, 279 F.3d 441, 44 (7th Cir. 2002), and argues that an ALJ need not list every single impairment specifically as long as the ALJ indicates similar conditions in their hypothetical.

The Commissioner argues that the ALJ posed all the limitations that are supported by substantial evidence in the hypothetical, and that, therefore, the VE's testimony was substantial evidence. Finally, the Commissioner rebuts Ms. Som's argument that the ALJ ignored the VE's cross-examination testimony by citing *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir.

2009), which states that an "ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible." Thus, the Commissioner contends that, because the ALJ's hypothetical question to the VE included all of the limitations she found credible, the Court should affirm the decision.

The Commissioner's argument that an ALJ need not provide a list of a claimant's impairments in their hypotheticals proposed to VE's, but that they "ordinarily must include all limitations supported by medical evidence in the record[,]" *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002), is correct. Furthermore, the Commissioner is correct in that an ALJ need only incorporate into their hypotheticals impairments and limitations that they deem credible. *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009). Indeed, an ALJ's failure to include all impairments and limitations in proposed hypotheticals is excused when the VE to whom the hypothetical is proposed has read the claimant's medical records and included them in their testimony. *Ragsdale v. Shalala*, 53 F.3d 816,820 (7th Cir. 1995). However, in this case, this exception is not applicable since: 1) the VE indicated that she reviewed the exhibits and heard testimony regarding Ms. Som's work history (R. 52), but never gave any indication that she reviewed the medical records; and 2) stated that her answers were based on the hypothetical and not information from the record. (R. 54).

During the hearing, in her hypothetical, the ALJ proposed to the VE:

> [A]n individual such as the Claimant's age, education and work experience. Such an individual can lift 10 pounds occasionally, less than 10 pounds frequently; stand/and/or walk two hours during a eight-hour workday; sit six hours during a eight-hour work day with a sit/stand option at will. (R. 53).

The ALJ's proposed hypothetical to the VE during the hearing proves to be inadequate to satisfy a proper step five determination. Even though the ALJ is not required to provide an exhaustive list of Ms. Som's impairments and limitations, she is at least required to provide references to what is supported by medical records and is found to be credible. As the Commissioner highlighted, the Seventh Circuit in *Donahue v. Barnhardt*, 279 F.3d 441, 44 (7th Cir. 2002), found that an exhaustive or exact list is not needed as long as the ALJ references similar circumstances or issues that relate to the claimant's limitations and impairments. The ALJ did provide some insight as to what limitations Ms. Som possessed, but she failed to provide any insight as to what her impairments were.

Furthermore, it appears that the cross-examination of the VE was not taken into consideration. There is no indication of any portion of that testimony being included in the step five determination analysis. While the Commissioner's argument that an ALJ need only include information they find credible in their proposed hypotheticals is correct, he is incorrect in asserting

that the ALJ included all credible information in her hypothetical. Even though the ALJ may have found Ms. Som's treating physicians' determination of her inability to sustain light work not credible, she did find their other findings to be credible. (R. 24). Had she included this credible information in her hypothetical, then there would have been a reference to depression affecting work performance (R. 239), or the inability to keep concentration (R. 239), or the possibility of the hypothetical person missing four or more days of work a month. (R. 241). The cross-examination of the VE brought forth some of the issues that the ALJ's hypothetical failed to mention. However, the issues are absent from the step five determination analysis.

Due to the ALJ's failure to reference Ms. Som's medically supported impairments, the absence of credible medical evidence, and any reference to any consideration of the VE's cross-examination testimony, this case must be remanded.

## **CONCLUSION**

For the reasons set forth above, the Court denies the Commissioner's Cross-Motion for Summary Judgment and grants Ms. Som's Motion for Summary Judgment.  The decision is remanded for further proceedings consistent with this opinion.

Dated: April 19 , 2012

ENTERED:

_Arlander Keys_
_____

ARLANDER KEYS
United States Magistrate Judge